United States District Court
District of Massachusetts

---

Docket No. 04-10303

**United States,**

v.

**Rashaun Scott,**

---

## Memorandum In Support Of Motion To Suppress Or For Franks Hearing

---

### Issues Presented

1.     Whether the defendant is entitled to suppression of evidence found during a search of his residence where the affidavit in support of the search warrant relies solely upon cryptic and ambiguous telephone conversations and where the search warrant ultimately issued based on a mere hunch rather than on probable cause.

2.     Whether, assuming the affidavit establishes probable cause, the defendant is entitled to a *Franks* hearing (a) where the finding of probable cause depends on the affiant's statement that the term "things" is common street lingo for firearms, (b) where, in fact, that term has no such

meaning, and (c) where the affiant knowingly or recklessly included that false information for the sole purpose of establishing probable cause.

## Statement of Facts

For purposes of this memorandum, the defendant will rely on the facts set forth in the affidavit in support of application for search warrant filed by Officer George Almeida of the Brockton Police Department. The relevant portions of that affidavit are as follows:

2.    I have information based upon conversations with Peter Carver of the MA State Parole and Deputy Edmund Desmarais of the Bristol County House of Correction that there is a firearm unlawfully being stored at 26 Victory St.

3.    26 Victory St. is described as a brown, single family, wood construction home with the number 26 affixed to the front door.

4.    On Friday, May 14, 2004 at approx. 1200 hrs. I (Detective Almeida) spoke with Massachusetts Parole Officers Peter Carver and Jim McCarthy in regards to Rashaun Scott (D.O.B. 08/31/80). Parole Officer McCarthy informed me that he had received a call from Deputy Edmund Desmarais of the Bristol County House of Correction. Desmarais informed him that while monitoring Scott's phone calls he heard Scott referring to some firearms at his home on 26 Victory St. Note: Rashaun Scott is currently an inmate at the Bristol House of Correction.

5.    On Friday, May 14, 2004, I spoke with Deputy Edmund Desmarais by phone in regards to

Scott's phone conversation. Desmarais informed me that inmate Rashaun had an open telephone account at the Bristol House of Correction (pin #113645). He stated that Scott placed a phone call to his home at 26 Victory St. (phone number 508-588-2607) on May 13, 2004. Deputy Desmarais was monitoring the live phone call at the time. Scott, at first, was heard speaking to his mother. He then asked to speak with his sister Cassandra. Deputy Demarais heard Rashaun speaking to his sister about what he believed to be firearms. He informed me that he would record a copy of Scott's phone calls from May 13, 2004 on compact disc and report to the Brockton Police station with same.

6.    On Friday, May 14, 2004 at approx. 1450 hours, Detective Hilliard and I (Almeida) spoke with Deputy Desmarais at the Brockton Police Station. We were provided with a compact disk copy of Rashaun Scott's phone calls. Detective Hilliard and I listened to the recorded copy of Scott's phone calls. Rashaun was hearrd initially talking to his mother in regards to a home visit by a representative of the Massachusetts State Parole. He informed his mother that he would be speaking in riddles. Scott then asked to speak to his sister Cassandra (referring to her by name). He then instructed Cassandra to enter his room and to look under the mattress for them *"things"*. Detective Hilliard and I are both familiar with the street term *"things"* referring to firearms. He informed Cassandra that there are two *"things"* under the mattress. Scott instructed Cassandra not to say what she saw under the mattress over the phone. He was heard referring to one of the *"things"* as the long one. Cassandra told him that she saw the long one in his closet. He advised her to put the *"thing"* in her closet. Cassandra then advised Rashaun that their mother had found one of the *"things"* and threw it away. Rashaun became very upset upon hearing this. He asked Cassandra to put his mother on the phone and inquired about the *"thing"*. She informed Scott that she threw the *"thing"* in a dumpster. Scott replied that he didn't want (Parole) to find it when they inspected the home.

Cassandra then returned to the phone and began whispering, "the long one is still there." "Oh, Yeah", replied Scott. "Mom didn't know that one was in your room, the long one is still in your room," answered Cassandra. Scott replied, "You know what to do with that, I already told you what to do." While speaking with Cassandra Rashaun Scott is heard speaking to another inmate and says "My mother threw one of them away, but she didn't find the other one cuz I have one down, a quick load, so I can run in the house, quick load that fucka and run out of the house".

7.     Brockton Police in house computer check revealed that Scott has been arrested in the past for firearms violations. On July 18, 2000, Scott was arrested for unlawful possession of a firearm and unlawful possession of ammunition. On January 13, 2001, Scott was arrested in Brockton for armed robbery, assault by means of a gun and intimidation of a witness. On March 27, 2002 Scott was arrested on a warrant and was found to be unlawfully in possession of ammunition. 26 Victory St. was given as Scott's home address at the time of booking on each arrest.

8.     A board of probation check on Rashaun Scott revealed a past conviction for firearm violations. On December 11, 2002, Scott was sentenced to six (6) months in the house of correction for unlawful possession of a firearm.

9.     Deputy Desmarais informed me that Rashaun Scott has informed House of Correction officials that his intended place of residence is 26 Victory St. upon release. Parole officer Peter Carver also informed me that Rashaun Scott has informed Massachusetts Parole that he will be living at 26 Victory St. upon his release from jail.

10.    A board of probation check on the residents of 26 Victory St., Cassandra Scott, Edward Scott and Geraldine Scott, confirmed that none are licensed to carry firearms or possess firearms.

11.    Based on my experience as a Police officer, I know that those who own or possess firearms generally maintain possession of for a long time. Persons who own or possess firearms generally keep them on their person or in their residence because of firearms are somewhat expensive and do not easily wear out. In my experience, firearms are unlike narcotics or currency, which are often exchanged soon after being obtained. Firearms are similar to tools, which a householder buys and maintains over a long period.

12.    Based on the foregoing reliable information received from Deputy Desmarais and information received from Rashaun Scott's recorded jailhouse phone calls, this officer believes that there is probable cause that a firearm is unlawfully being concealed at the residence herein described.

## I.    The Defendant Is Entitled To Suppression Of Evidence Found During A Search Of His Residence Where The Affidavit In Support Of The Search Warrant Relies Solely Upon Cryptic And Ambiguous Telephone Conversations And Where The Search Warrant Ultimately Issued Based On A Mere Hunch Rather Than On Probable Cause

In support of his application for a search warrant, Officer Almeida submitted a detailed and lengthy affidavit. Notwithstanding the level of detail, that affidavit described and ultimately relied in large part on cryptic language that, according to the affiant, described a firearm allegedly stored at the defendant's house. Ultimately, that affidavit failed to establish anything more than the affiant's hunch that a

firearm would be found at the location described. It fell far
short of the required showing of probable cause.
Consequently the search warrant is fatally flawed, the
evidence uncovered during its execution was seized in
violation of the defendant's constitutional rights, and that
evidence must be suppressed.

Any idea that a search can be justified by what it turns
up was long ago rejected in America's constitutional
jurisprudence. *See Bumper v. North Carolina*, 391 U.S. 543,
548 (1968) (search prosecuted in violation of the constitution
is not made lawful by what it brings to light). "Probable
cause to issue a search warrant exists when 'given all the
circumstances set forth in the affidavit ... there is a fair
probability that contraband or evidence of a crime will be
found in a particular place.'" *United States v. Keene*, 341
F.3d 78, 81 (1st Cir. 2003), citing *Illinois v. Gates,* 462 U.S.
213, 238 (1983). See also *United States v. Sokolow*, 490 U.S.
1, 7 (1989) (court has held that probable cause means "a fair
probability that contraband or evidence of a crime will be
found"). "The officer, of course, must be able to articulate
something more than an 'inchoate and unparticularized

suspicion or "hunch."" *United States v. Sokolow*, 490 U.S. 1, 7 (1989), citing *Terry v. Ohio,* 392 U.S. 1, 27 (1968).

A warrant application must demonstrate probable cause to believe (1) that a particular person has committed a crime (the "commission" element), and (2) that enumerated evidence of the offense will be found at the place to be searched (the "nexus" element). *See United States v. Beckett*, 321 F.3d 26, 31 (1st Cir. 2003), citing *United States v. Zayas Diaz,* 95 F.3d 105, 110-11 (1st Cir. 1996). "The task of the reviewing court is to determine whether 'a substantial basis' existed for the magistrate's determination that probable cause existed." *United States v. Keene*, 341 F.3d at 81, citing *Illinois v. Gates,* 462 U.S. 213, 238 (1983). Where there is any ambiguity in the primary information relied upon the affiant, a court addressing the sufficiency of the search warrant affidavit must consider the strength and value of any corroborative information obtained by independent police work. *Id.*, citing *Illinois v. Gates*, 462 U.S. at 241. Ultimately, if the affidavit, viewed as a whole, fails to establish probable cause, the evidence uncovered during the execution of the warrant must be excluded from the case

against the defendant. See *United States v. Beckett*, 321 F.3d at 31, citing *United States v. Brunette,* 256 F.3d 14, 19 (1st Cir. 2001).

In this case, the affiant focuses primarily on portions of the intercepted telephone conversations in which the defendant asked his sister "to enter his room and to look under the mattress for them 'things.'" [Almeida Affidavit, ¶6]. Focusing on the repeated references to "things" in these conversations, Almeida asserts that "the street term 'things' refer[s] to firearms. " [Almeida Affidavit, ¶6]. Criminals do indeed use jargon to refer to illegal objects and activities. *United States v. Guerra-Marez,* 928 F.2d 665, 675 (5th Cir. 1991), *cert. denied,* 502 U.S. 917 (jury could have reasonably concluded that certain phrases used by were code words for contraband). In particular, drug dealers often describe their product using code or cryptic language.[1] Other criminals

---

[1] See *United States v. Barrow*, 400 F.3d 109, 113 (2nd Cir. 2005) ("sniff" was a street term for heroin or cocaine); *Gousse v. Ashcroft*, 339 F.3d 91, 93 (2nd cir. 2003) (a bag, which was a street term for heroin); *United States v. Burton*, 288 F.3d 91, 104 (3rd Cir. 2002) (Task Force believed "five brick" to be a street term for 1000 grams); *United States v. Robinson*, 167 F.3d 824, 827 n.2 (3rd Cir 1999) (A "speed-ball" is the street term for the often dangerous mixture of equal parts cocaine and heroin); *United States v. Hatchett*, 31 F.3d 1411, 1413 n.1 (7th Cir. 1994) ("Shopping" is a

refer to different types of contraband using similar types of code. *See United States v. Hamilton*, 263 F.3d 645, 650 (6th Cir 2001) ("fresh wax" is a street term for stolen credit cards). Criminals also speak in code in describing firearms. *See United States v. Flowers*, 981 F.Supp. 708, 709 (D.Mass.,1997) ("nines," a common street term for nine millimeter caliber handguns); *State v. Perron*, 660 So.2d 903, 904 n.1 (La.App. 4 Cir.,1995) ("GAK" street term for gun).

The difficulty with this case is that the words in question simply "were too ambiguous to assign an illegal meaning to them with any certainty." *Eimann v. Soldier of Fortune Magazine, Inc.*, 880 F.2d 830, 833 (5th Cir. 1989). Notwithstanding the affiant's attempt to attribute a sinister meaning to the word, "thing" is such a generic term that it could refer to almost anything, illegal or otherwise. The defendant strongly disputes the affiant's contention that the term has a particular street meaning, and he contends that without more information placing it in context, the affiant's

street term used by drug dealers and users referring to one's interest in purchasing drugs and demonstrates that persons using the term are knowledgeable of the drug culture lexicon); *United States v. Longbehn*, 898 F.2d 635, 640 n.9 (8th Cir. 1990) ("Crank" is a common street term for methamphetamine).

definition of that term and the conclusions based on that
definition must be excluded from the probable cause
analysis. *Contrast United States v. Acosta*, 965 F.2d 1248,
1249 (3rd Cir. 1992) (reference to "stuff" properly considered
as referring to illegal drugs where suspect attempting to
abandon drugs during a drug raid),

Nothing in the circumstances described in the affidavit
places that term in context or otherwise saves the search
warrant. *Contrast United States v. Gotti*, 42 F.Supp.2d 252,
280-281 (S.D.N.Y. 1999) (motion to suppress for lack of
probable cause denied where intercepted conversations
which were somewhat ambiguous, were not unreasonably
interpreted as criminal; taken together with other
information that had been disclosed by the investigation,
there was ample demonstration of probable cause). While the
defendant clearly was speaking in riddles, he knew his
conversations were being monitored.  He may therefore have
spoken in code in order to conceal illegal conduct of some
sort, but he may have done so to shield otherwise innocuous
conversations from eavesdroppers or out of habit. The
conversations described may very well have given the

officers a hunch that he was up to no good, but this hunch did not support a finding of probable cause. It should have been a starting point rather than the end point to the investigation.

The reference to a statement allegedly made to another inmate on one of the tapes fails to help the government in the present circumstances. According to the affiant, the defendant is heard on the tape stating; "My mother threw one of them away, but she didn't find the other one cuz I have one down, a quick load, so I can in the house, quick load that fucka and run out of the house." [Almeida Affidavit, ¶6]. That portion of the tape is rather difficult to hear, since the defendant is not speaking directly into the phone. There are also a number of differences between the language quoted by the affiant and the language in the transcript provided by the government. Whichever language this court chooses to accept, that statement is also highly ambiguous and is not sufficient to place the term "things" in context.

Further, the reference to the defendant's past firearm offenses does not help the government. The fact that he may

have been arrested and a firearm seized does not establish

that he retained additional weapons thereafter.  In fact, it is

likely that any weapons he had would have been seized or

disposed of after his arrest. Upon receiving information

regarding the intercepted telephone calls, the police did

nothing further to investigate the substance of the calls

other than to run his criminal record. *See United States v.*

*Keene*, 341 F.3d at 81.

The home of a private citizen has always enjoyed a

high degree of protection.[2] In this case, the police based their

search of the defendant's house on nothing more than a

hunch based on cryptic and featureless language during an

---

[2] An old and established freedom is that the house of every one is to him as his castle and fortress is codified in the Fourth Amendment to the United States Constitution, as well as Article 14 of the Massachusetts Declaration of Rights, and G.L. c. 276, § 2 (2003 ed.). *See Commonwealth v. Cundriff*, 382 Mass. 137 (1980), *citing Semayne's Case*, 77 Eng. Rep. 194, 195 (K.B. 1603) ("house of every one is to him as his castle and fortress"); *Day v. Lawrence*, 167 Mass. 371, 374 (1897) (householder and family are entitled to the protection of the house as their castle); *Commonwealth v. Reynolds*, 120 Mass. 190, 196 (1876) (The doctrine that a man's house is his castle, which cannot be invaded in the service of process, was always subject to the exception that the liberty or privilege of the house did not exist against the king). *See also* Timothy Lynch, *In Defense Of The Exclusionary Rule*, 23 Harv. J.L. & Pub. Pol'y 711, 722 (2000) ("A man's house is his castle; and whilst he is quiet, he is as well guarded as a prince in his castle."), *citing* James Otis, Speech on the Writs of Assistance (1761).

intercepted telephone conversation. In the absence of
probable cause, the search violated his rights under the
Fourth Amendment, and he is entitled to suppression of the
fruits of that unlawful search. *See United States v. Beckett*,
321 F.3d at 31.

**II. Assuming The Affidavit Establishes Probable Cause, The Defendant Is Entitled To A *Franks* Hearing (A) Where The Finding Of Probable Cause Depends On The Affiant's Statement That The Term "Things" Is Common Street Lingo For Firearms, (B) Where, In Fact, That Term Has No Such Meaning, And (C) Where The Affiant Knowingly Or Recklessly Included That False Information For The Sole Purpose Of Establishing Probable Cause**

Assuming the officer's affidavit establishes probable
cause to believe that one or more firearms would likely be
found at the defendant's residence, the defendant contends
that there are serious questions as to the truthfulness of key
information set forth in that affidavit. Specifically, the
defendant contends that the term "things" is not a common
street term for firearms, that the affiant clearly knew that
fact, and that he knowingly or recklessly included such
information in the affidavit for the sole purpose of
establishing probable cause where none existed. Without the
information that the defendant now challenges as false, the

affidavit would not have provided probable cause to search the defendant's residence. The defendant is entitled to a *Franks* hearing at which he expects to establish his entitlement to suppression of the fruits of the search pursuant to the warrant.

Ordinarily, a defendant seeking to suppress evidence seized pursuant to a search warrant is confined to the "four corners" of the affidavit.  In some circumstances, however, a defendant may challenge the truthfulness of statements made by the affiant. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). To warrant a *Franks* hearing, a defendant must make a two-part showing.  First, the defendant must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the warrant affidavit. *Id.* at 155-156; *United States v. Nelson-Rodriguez*, 319 F.3d 12, 34 (1st Cir. 2003). "A substantial showing "'lies somewhere between mere denials on the one hand and proof by a preponderance [of the evidence] on the other."' *United States v. Legault*, 323 F.Supp. 217, 225 (D.Mass 2004), quoting *Commonwealth v. Ramirez*, 416 Mass. 41, 49-50 (1993) and

*People v. Lucente*, 506 N.E.2d 1269, 1277 (Ill. 1987). Second, the defendant must show that the challenged material is necessary to a finding of probable cause. *Id.* at 155-156; *United States v. Stewart*, 337 F.3d 103, 105-106 (1st Cir. 2003); *United States v. Higgins*, 995 F.2d 1, 4 (1st Cir. 1993). Upon meeting both requirements, the defendant is entitled to an evidentiary hearing. *United States v. Nelson-Rodriguez*, 319 F.3d at 34; *United States v. Adams*, 305 F.3d 30, 36 n.1 (1st Cir. 2002).

In this case, the defendant expects to show clearly and unequivocally that the officer's statements describing the term "things" as common street lingo for firearms was materially false.  Moreover, that information, which had to have been included intentionally, was key to a showing of probable cause. *Contrast United States v. Stewart*, 337 F.3d at 106 (notwithstanding alleged false statements, showing of probable cause could not have been stronger). In the absence of that information, the affidavit necessarily would have failed to establish probable cause.

In these circumstances, the defendant is entitled to an evidentiary hearing, and ultimately, to suppression of the fruits of the unlawful search.

## III.  Conclusion

Based on the authorities cited and the reasons aforesaid, the defendant requests that the evidence uncovered during the execution of the search warrant be excluded from the case against him. In the alternative, he requests that he be granted a *Franks* hearing.

Respectfully submitted,

Rashaun Scott,
*By his attorney,*

C. Samuel Sutter
B.B.O. # 542496
203 Plymouth Ave.
Building #7
Fall River, MA  02721
(508) 647-8633