```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | CRIMINAL NO. 04-10303-RCL |
| ) | |
| RASHAUN SCOTT ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS OR FOR FRANKS HEARING**

Defendant Rashaun Scott (the "defendant") has moved to suppress the evidence recovered pursuant to a search of his home or, in the alternative, for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). For the reasons that follow, this Court should find that the affidavit submitted in support of the search warrant did establish probable cause for the search; that the defendant has failed to make the substantial preliminary showing that the affidavit contains materially false information such as would entitle him to a Franks hearing; that the search in any event should be upheld under the good-faith exception; and that the defendant's motion should therefore be denied.

**FACTS**

On May 14, 2004, at approximately 8:00 p.m., members of the Brockton Police Department executed a search warrant at the defendant's parents' home, located at 26 Victory Street in Brockton. The police recovered from a closet in the defendant's sister's room a J.C. Higgins, Model 20, 12 gauge shotgun bearing no serial number.

The probable cause for the search warrant arose largely from

a taped prison call that the defendant made to his home the previous day.  As of May 13, 2004, the defendant was incarcerated at the Bristol County House of Correction.  He was scheduled to be released on parole in the relatively near future.  In anticipation of his release, his parole officer had to visit the defendant's intended residence on release, which, in this case, was the house in which the defendant's parents and sister lived in Brockton.

On March 13, 2004, the defendant placed a telephone call to his home.  This call was subject to both monitoring and recording by the institution.  The defendant spent much of the call having his sister Cassandra place, or attempt to place, calls to various third parties.  Near the end of the call, however, the defendant spoke to both Cassandra and his mother.  The search warrant affidavit summarized the conversation, together with other relevant information, as follows:

> 2.  I [Brockton Police Officer George C. Almeida] have information based upon conversations with Peter Carver of the MA State Parole and Deputy Edmund Desmarais of The Bristol county House of Correction that there is a firearm unlawfully being stored at 26 Victory St.
>
> 3.  26 Victory St. is Described [sic] as a brown, single family, wood construction home with the number 26 affixed to the front door.
>
> 4.  On Friday, May 14, 2004 at Approx. [sic] 1200 hrs. I (Detective Almeida) spoke with Massachusetts Parole Officers Peter Carver and Jim McCarthy in regards to Rashaun Scott

(D.O.B. [redacted]). Parole Officer McCarthy informed me that Scott is eligible for parole within the next few weeks. He informed me that that [sic] he had received a call from Deputy Edmund Desmarais of the Bristol County House of Correction. Desmarais informed him that while monitoring Scott's phone calls he heard Scott referring to some firearms at his home on 26 Victory St. Note: Rashaun Scott is currently an inmate at the Bristol House of Correction.

5. On Friday, May 14, 2004, I spoke with Deputy Edmund Desmarais by phone in regards to Scott's phone conversation. Desmarais informed me that inmate Rashaun Scott has an open telephone account at the Bristol House of Correction (pin #113648). He stated that Scott placed a phone call to his home at 26 Victory St. (phone number 508 [redacted]) on May 13, 2004. Deputy Desmarais was monitoring the live phone call at the time. Scott, at first, was heard speaking to his mother; [sic] He then asked to speak to his sister Cassandra. Deputy Desmarais heard Rashaun Scott speaking to his sister about what he believed to be firearms. He informed me that he would record a copy of Scott's phone calls from May 13, 2004 on compact disk and report to the Brockton Police Station with same.

6. On Friday, May 14, 2004 at approx. 1450 hours, Detective Hilliard and I (Almeida) spoke with Deputy Desmarais at the Brockton Police Station. We were provided with a compact disk copy of Rashaun Scott's phone calls. Detective Hilliard and I listened to the recorded copy of Scott's phone calls. Rashaun was heard initially talking to his mother in regards to a home visit by a representative of the Massachusetts State Parole. He informed his mother he would be speaking in riddles. Scott then asked to speak to his sister Cassandra (referring to her by name). He Then [sic] instructed Cassandra to enter his room and to look under the mattress for them "things". Detective

3

Hilliard and I are both familiar with the street term "things" referring to firearms. He informed Cassandra that there are two "things" under the mattress. Scott instructed Cassandra not to say what she saw under the mattress over the phone. He was heard referring to one of the "things" as the long one. Casandra [sic] told him that she saw the long one in his closet. He advised Cassandra to put the "thing" in her closet. Cassandra then advised Rashaun that their mother had found one of the "things" and threw it away. Rashaun became very upset upon hearing this. He asked Cassandra to put his mother on the phone and inquired about the "thing". She informed Scott that she threw the "thing" in a dumpster. Scott replied that he didn't want (Parole) to find it when they inspected the home. Cassandra then returned to the phone and began whispering, "the long one is still there." "Oh Yeah [sic]", replied Scott. "Mom didn't know that one was in your room, the long one is still in your room." [sic] answered Cassandra. Scott replied, ["]You know what to do with that, I already told you what to do." While speaking with Cassandra Rashaun Scott is heard speaking with another inmate and says "My mother threw one of them away, but she didn't find the other one cuz I have one down, a quick load, so I can run in the house, quick load that fucka and run out of the house".

7. Brockton Police in house computer check revealed that Scott has been arrested in the past for firearms violations. On July 18, 2000 Scott was arrested for unlawful possession of a firearm and unlawful possession of ammunition. On January 13, 2001, Scott was arrested in Brockton for Armed robbery, Assault by means of a gun and Intimidation of a witness. On March 27, 2002 Scott was arrested on a warrant and was found to be unlawfully in possession of ammunition. 26 Victory St. was given as Scott's home address at the time of booking on each arrest.

8. A board of probation check on Rashaun Scott revealed a past conviction for firearm violations. On December 11, 2002, Scott was sentenced to six (6) months in the house of correction for unlawful possession of a firearm.

9. Deputy Desmarais informed me that Rashaun Scott has informed House of Correction officials that his intended place of residence is 26 Victory St. upon release. Parole Officer Peter Carver also informed me that Rashaun Scott has informed Massachusetts Parole that he will be living at 26 Victory St. upon his release from jail.

10. A board of probation check on the residents of 26 Victory St., Cassandra Scott, Edward Scott and Geraldine Scott, confirmed that none are licensed to carry firearms of [sic] possess firearms.

11. Based on my experience as a Police officer, I know that those who own and posses [sic] firearms generally maintain possession of [sic] for a long time. Persons who own or posses [sic] firearms generally keep them on their person or in their residence because of firearms are somewhat expensive and do not wear out. In my experience, firearms are unlike narcotics or currency, which are often exchanged soon after being obtained. Firearms are similar to tools, which a householder buys and maintains over a long period.

12. Based on the foregoing reliable information received from Deputy Desmarais and information received from Rashaun Scott's recorded jailhouse phone calls, this officer believes that there is probable cause that a firearm is unlawfully being concealed at the residence herein described.

Based on this information, clerk Magistrate Kevin P. Creedon issued a search warrant authorizing the police to search 26

Victory Street for firearms and related items.

## ARGUMENT

The defendant argues both that the search warrant affidavit failed to establish probable cause and that the affidavit contained materially false information entitling him to a <u>Franks</u> hearing.  Both arguments are without merit.

### I.  THE AFFIDAVIT ESTABLISHES PROBABLE CAUSE

Probable cause to conduct a search exists when evidence establishes the likelihood that an offense has been committed and that there is sound reason to believe a particular search will turn up evidence of the offense or contraband.  <u>United States v. Khounsavanh</u>, 113 F.3d 279, 283 (1st Cir. 1997).  The probable cause standard does not require that this belief necessarily be correct, or even that it be more likely true than not.  <u>United States v. Feliz</u>, 182 F.3d 82, 87 (1st Cir. 1999).  As the First Circuit explained in <u>United States v. Melvin</u>, 596 F.2d 492, 495 (1st Cir. 1979):

> [A]ppellant reads the phrase "probable cause" with emphasis on the word "probable," and would define it mathematically to mean "more likely than not" or "by a preponderance of the evidence."  This reading is incorrect.  The phrase is less stringent than that[;] the words "reasonable cause" are perhaps closer to what is meant.

The Supreme Court, moreover, has been clear that a review of a magistrate's determination of probable cause must be extremely

deferential:

> [W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." [Cite omitted]. "A grudging or negative attitude by reviewing courts toward warrants," [cite omitted], is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant. "Courts should not invalidate . . . warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." [Cite omitted].
>
> . . . Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a "substantial basis for . . . conclud[ing]" that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more. [Cites omitted].

Illinois v. Gates, 462 U.S. 213, 236 (1983).

Here, it is only by adopting the grudging, negative attitude eschewed by the Supreme Court that the search warrant affidavit could be found lacking. Here, the magistrate knew that the defendant was soon to be released from incarceration; knew that, in that connection, a parole officer was first going to visit the defendant's parents' house, in which the defendant planned to live; knew that the defendant chose to speak to his mother and sister in riddles; knew that, when he got his sister on the phone, he started talking not only about "things" but indicated that there were two "things" and referred to one of them as the

long one; knew that the defendant wanted his sister to look under his mattress for the "things" but did not want her to say over the telephone what it was that she saw; knew that, after his sister told the defendant that the long one was in his closet, the defendant asked her to move it into her room; knew that the defendant became upset when informed that his mother had thrown out the other "thing"; knew that, in talking to his mother about her having done so, the defendant indicated that he did not want Parole to find it; and knew that, in a side conversation with a fellow inmate, the defendant had told the inmate that his mother had thrown one away but had not found the other one, and used the term "quick load" in reference to the one his mother had not found.  Viewing this information in a commonsense fashion, the magistrate could do little but conclude what was obvious: that the "long one" that was a "quick load" was a clear reference to a firearm; that the defendant was concerned that the parole officer who would be visiting the house before the defendant's release not find this firearm (indeed, the defendant initially was concerned that the parole officer not find two firearms, until he learned that his mother had disposed of one of them); that he was speaking in riddles and referring to the firearms as "things" with the hope that prison officials would not know what he was talking about; and that he particularly wanted his sister to move the "long one" from his own room so that it would not be there

when the parole officer inspected the room.  In short, the police had far more than a mere "hunch" that the defendant was storing a firearm in his parents' home.

The defendant places much emphasis on the officers' stated knowledge that "thing" is a street term for a firearm, arguing that, "without more information placing it in context, the affiant's definition of that term and the conclusions based on that definition must be excluded from the probable cause analysis."  Def. Mem. at 9-10 (citation omitted).  First, while the use of the term "thing" to mean firearm adds yet further support for the magistrate's probable cause determination, it is by no means necessary to that determination, as just shown.  Moreover, there *is* more information placing in context the defendant's use of that term, including the defendant's use of the term "long one," the defendant's use of the term "quick load," the defendant's obvious desire to avoid having the "things" he was discussing named over a recorded line, and the defendant's further desire to avoid having his parole officer find either of the "things" in a home visit.

The defendant also argues that the portion of the taped conversation in which the defendant had the side conversation with another inmate is difficult to hear; that the language Officer Almeida quoted differs from a transcript that the government has prepared; and that, whichever language the Court

9

chooses to accept, the statement is ambiguous.  First, the government's memory is that, at the time the government proffered the transcript for purposes of the defendant's detention hearing, the government made clear that it was a draft transcript that the government reserved the right to revise.  <u>See</u> Local Rule 116.4(B)(2)("A preliminary transcript may not be used at trial or in any hearing on a pretrial motion without the prior approval of the court based on a finding that the preliminary transcript is accurate in material respects and it is in the interests of the administration of justice to use it.").  Moreover, both the search warrant affidavit and the draft transcript agree that the defendant told the other inmate that his mother had thrown one of "them" away but that she had not found the other one; and both referred to the one the mother did not find as either a "quick load" or a "quick loader".  Using the phrase "quick load(er)" to describe a "long one" that one does not wish to identify by name over a recorded prison line and that one does not want a parole officer to find is not particularly ambiguous; indeed, it is difficult to imagine what the reference would be to if not to a firearm.

The defendant also argues that the affidavit's reference to the defendant's past firearms offenses does not contribute to the probable cause calculus, since presumably the defendant did not retain the firearms with which he was caught on earlier

10

occasions. See Def. Mem. at 11-12. But the defendant has misapprehended the import of the information regarding his prior gun arrests and conviction. The information was not included to create an inference that the defendant, in the taped call, was referring to one of the particular firearms that he possessed on these earlier occasions. Rather, it was included to show that the defendant has possessed firearms previously. While evidence of prior similar acts ordinarily is not admissible at *trial* to show a defendant's propensity to commit the charged crime, see Fed. R. Evid. 404(b), such information is relevant and appropriate to a magistrate's determination of whether probable cause exists to issue a search warrant. See United States v. Dauphinee, 538 F.2d 1, 5 (1st Cir. 1976)(search subject's record of violent crime a factor which, in conjunction with other indicia of subject's propensities and associations, would properly have influenced decision that probable cause existed to issue warrant).

In sum, viewing the totality of the circumstances presented in the search warrant affidavit in a common-sense fashion, see Gates, there plainly was probable cause for the issuance of the warrant.

## II. **THE DEFENDANT IS NOT ENTITLED TO A FRANKS HEARING**

The Supreme Court has recognized that there is a presumption of validity with respect to an affidavit supporting a

11

search warrant. <u>Franks</u>, 438 U.S. at 171. In order to obtain a hearing on whether a search warrant affidavit contains false information, a defendant must make a substantial preliminary showing that the affiant knowingly or recklessly included false information material to the finding of probable cause. <u>See id</u>. at 155-56. More specifically, the Court stated that, in order to show entitlement to an evidentiary hearing as to whether a warrant affidavit contains deliberately or recklessly false statements,

> the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

438 U.S. at 171-72.

Here, the defendant's request for a <u>Franks</u> hearing fails on two accounts. First, he has not provided this Court with sworn affidavits regarding the purportedly false statement in the

12

affidavit (that "things" is a street term for firearms). Instead, he has simply "contended" that this is the case in his unsworn memorandum, and seeks a hearing "at which he expects to establish his entitlement to suppression of the fruits of the search pursuant to the warrant." Def. Mem. at 13-14. This is the sort of unsupported, conclusory allegation, made with the same general desire to cross-examine, that the Supreme Court made clear in <u>Franks</u> is insufficient.

Second, and equally fatal to the defendant's position, is the simple fact that Officer Almeida's statement that "things" is a street term for firearms is not material to the probable cause calculus. One can excise that single sentence from the search warrant affidavit and still have abundant probable cause supporting the search warrant. As <u>Franks</u> itself makes clear, unless the information that a defendant claims is false is necessary to the probable cause determination, its inclusion in a search warrant affidavit does not entitle a defendant to a hearing.

## III.    **THE LEON GOOD FAITH EXCEPTION APPLIES**

Finally, even if the Court determines that the search warrant affidavit does not establish probable cause, the defendant's motion to suppress the fruits of the search should nonetheless be denied.

In <u>United States v. Leon</u>, 468 U.S. 897 (1984), the Supreme

13

Court held that, in most cases, the invalidity of a warrant should not serve to suppress the fruits of the subsequent search when the officer acted in objective good faith in executing the warrant.  Leon, 468 U.S. at 922.  Here, given the information set forth in the search warrant affidavit, the evidence plainly was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable".  See United States v. Brunette, 256 F.3d 14, 19 (1st Cir. 2001), citing Leon, 468 U.S. at 923.  Nor, as just shown, is it a case in which the record discloses that the magistrate was "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth."  Id.  The defendant makes an unsupported, conclusory claim that the officer was wrong about one sentence in the affidavit, but this one sentence was but a small part of the information upon which the officer relied.  And there is no suggestion that the magistrate "abandoned his detached and neutral role".  Leon, 468 U.S. at 926; see also United States v. Robinson, 359 F.3d 66, 69 (1st Cir. 2004).

In short, the Brockton police relied in good faith on a facially valid warrant, and the defendant's motion accordingly should be denied.

14

**CONCLUSION**

For the foregoing reasons, the defendant's motion to suppress evidence or for a <u>Franks</u> hearing should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:   /S/Robert E. Richardson
      ROBERT E. RICHARDSON
      Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

Suffolk, ss.                              Boston, Massachusetts
                                          May 23, 2005

I hereby certify that I caused a true copy of the foregoing was served by first-class mail upon counsel for the defendant, C. Samuel Sutter, Esq., 203 Plymouth Avenue, Building #7, Fall River, MA 02721.

                              /s/ Robert E. Richardson
                              Robert E. Richardson
                              Assistant U.S. Attorney